## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

UNITED STATES OF AMERICA,

     Plaintiff,

     v.

EMANUELA JOE JOSEPH and
MONIQUE WHEELER,

     Defendants.

CRIMINAL ACTION NO.
1:20-CR-114-WMR-CCB

## FINAL REPORT AND RECOMMENDATION

Defendants Emanuela Joe Joseph and Monique Wheeler are charged with conspiring with multiple other defendants to commit money laundering, in violation of 18 U.S.C. § 1956(h) (Count One). (Doc. 13). Both Defendants have filed motions to dismiss Count One of the indictment, (Docs. 402, 429), and Defendant Joseph has filed a motion to suppress statements, (Doc. 396). The motions to dismiss are similar, and the Court takes them up first, followed by Joseph's motion to suppress. For the reasons set forth below, the undersigned **RECOMMENDS** that the motions to dismiss and the motion to suppress be **DENIED**.

I.      **Defendants' Motions to Dismiss Count One of the Indictment**

Count One of the indictment charges Defendants with money laundering conspiracy, in violation of 18 U.S.C. § 1956(h). (Doc. 13). Neither of these two Defendants are charged in any other count. They both seek to dismiss Count One, arguing that the indictment fails to allege specific details to notify them of the charges to be defended against and does not enable them to rely upon a judgment as a bar against double jeopardy in any subsequent prosecution for the same offense. (Doc. 402 at 6; Doc. 429 at 5). Specifically, Defendants argue that there are no *facts* in the indictment showing that they knew the funds were criminally derived, that they knowingly and willfully joined a conspiracy, or that they received or made any transactions for the purpose of money laundering. (Doc. 402 at 6–7; Doc. 429 at 5). The Government filed a response, (Doc. 489), arguing that the indictment alleges the essential elements of the charged offense, provides Defendants with notice of the charges against them, and enables Defendants to plead double jeopardy in the future if necessary, and is therefore sufficient. *Id.* Neither Defendant filed a reply brief, and the matter is now ripe for review.

### A. The Indictment

Count One of the indictment charges Defendants with conspiring to commit money laundering. (Doc. 13 at 3–4). It alleges that from at least in or about October 2012, and continuing through in or about February 2020, in the Northern District

2

of Georgia and elsewhere, Defendants (along with 21 co-defendants) "did knowingly combine, conspire, agree, and have a tacit understanding with one another" and seven other named individuals, as well as other unnamed individuals, to commit an offense against the United States, that is:

> (a)      to knowingly conduct and attempt to conduct, and cause to be conducted, financial transactions affecting interstate and foreign commerce, which involved the proceeds of a specified unlawful activity, that is, wire fraud, in violation of Title 18, United States Code, Section 1343, and bank fraud, in violation of Title 18, United States Code, Section 1344, knowing that said transactions were designed in whole and in part to conceal and disguise the nature, location, source, ownership, and control of the proceeds of specified unlawful activity, and that while conducting and attempting to conduct such financial transactions, knew that the property involved in the financial transactions represented the proceeds of some form of unlawful activity; in violation of Title 18, United States Code, Section 1956(a)(1)(B)(i); and

> (b)      to knowingly engage and attempt to engage in, and cause the engagement in, monetary transactions by, through, and to a financial institution, affecting interstate and foreign commerce, knowing that such transactions involved criminally derived property of a value greater than $10,000, such property having been derived from a specified unlawful activity, that is, wire fraud, in violation of Title 18, United States Code, Section 1343; and bank fraud, in violation of Title 18, United States Code, Section 1344; in violation of Title 18, United States Code, Section 1957.

*Id.* at 3–5. The indictment goes on to allege that the conspirators (including Defendants) "were all residents of, or had ties to, the Atlanta metro area" and that

3

"[m]ost of the Defendants and Conspirators were of West African descent, and they served as money launderers for other West African conspirators throughout the world who conducted cyber-enabled fraud, including [business email compromise] BEC, romance scams, and retirement account scams, targeted at companies and individuals across the United States." *Id.* at 9. The indictment alleges that the conspirators communicated with one another to launder funds obtained through BEC, romance scams, and retirement account scams; set up personal and business bank accounts to receive funds acquired through the schemes; registered sham companies and then set up bank accounts in the names of those companies; and quickly dispersed funds from those bank accounts through interstate and foreign wire transfers to other bank accounts not associated with the fraud schemes, or by making check or cash withdrawals, all in an attempt to conceal the source of the funds obtained through the illegal schemes. *Id.* at 10–12. The indictment identifies 32 sham companies and the conspirators those companies are associated with, including one (E Publishing, LLC) that is associated with Defendant Joseph. *Id.* Count One charges that Defendants' actions violated 18 U.S.C. § 1956(h). *Id.* at 3.

The indictment also identifies a number of overt acts, including these that involved Defendants Wheeler and Joseph:

4

16. On or about September 6, 2018, as a result of a BEC scheme involving victim Z.B.C., a company located in Texas, spoofed emails were sent to Z.B.C.'s financial institution with instructions to send a wire, in the amount of $226,622.50, to Wells Fargo Bank account, ending in 9770, held in the name of Ress Equip and Supply Group, Inc., and controlled by Defendant OKANG. On or about September 8, 2018, funds from the Wells Fargo Bank account were used to purchase cashier's check #6697401345, in the amount of $71,010.00, made payable to Defendant WHEELER. Defendant WHEELER subsequently deposited the cashier's check into a Wells Fargo Bank account that she controlled.

24. From on or about September 19, 2012, through on or [about] November 21, 2017, as a result of a romance scam involving victim J.K., J.K. sent several wire transfers and made several cash deposits, totaling approximately $1,896,939.52, to multiple bank accounts controlled by Defendants, including the following: (1) a wire transfer, in the amount of $30,000.00, to Wells Fargo Bank account ending in 8460, controlled by a close associate of Defendant OJO, of which $30,000.00 was immediately withdrawn and deposited into Wells Fargo Bank account ending in 9060, controlled by Defendant OJO; (2) cash deposits to Defendant JOSEPH's Bank of America account ending in 4670, in the amounts of $500.00, $1,000.00, $4,500.00, $5,000.00, and 5,000.00; and (3) cash deposits to Defendant OJO's Wells Fargo Bank account ending in 9060, in the amounts of $2,500.00, $5,300.00, $5,000.00, and $5,000.00.

27. On or about May 12, 2017, and on or about June 4, 2017, as a result of a romance scam involving victim A.P.V., wire transfers, in the amounts of $12,000.00 and $4,000.00, were sent from A.P.V.'s bank account to a Bank of America account held by Defendant JOSEPH. On or about August 1, 2017, a wire transfer, in the amount of $21,430.00, was sent from A.P.V.'s bank account to BB&T bank account ending in 7854, controlled by Defendant OJO.

(Doc. 13 at 13–19).

### B. Analysis

The Federal Rules of Criminal Procedure provide that an indictment "must be a plain, concise, and definite written statement of the essential facts constituting the offense charged." Fed. R. Crim. P. 7(c)(1). "An indictment is sufficient if it (1) presents the essential elements of the charged offense, (2) notifies the accused of the charges to be defended against, and (3) enables the accused to rely upon a judgment under the indictment as a bar against double jeopardy for any subsequent prosecution for the same offense." *United States v. Chalker*, 966 F.3d 1177, 1190 (11th Cir. 2020) (internal quotation marks omitted). "And when an indictment specifically refers to the statute on which the charge was based, the reference to the statutory language adequately informs the defendant of the charge." *Id.* (internal quotation marks omitted). "Nevertheless, even when an indictment 'tracks the language of the statute, it must be accompanied with such a statement of the facts and circumstances as will inform the accused of the specific offense with which he is charged.'" *United States v. Durrett*, 524 F. App'x 492, 493 (11th Cir. 2013) (alteration omitted) (quoting *United States v. Bobo*, 344 F.3d 1076, 1083 (11th Cir. 2003)).

6

In judging the sufficiency of an indictment, the Eleventh Circuit has cautioned that courts should give the charging document "a common sense construction, and its validity is to be determined by practical, not technical, considerations." *Chalker*, 966 F.3d at 1190 (internal quotation marks omitted). In considering a motion to dismiss, the court "is limited to reviewing the *face* of the indictment and, more specifically, the *language used* to charge the crimes." *United States v. Sharpe*, 438 F.3d 1257, 1263 (11th Cir. 2006) (emphasis in original). This is so because "a court may not dismiss an indictment on a determination of facts that should have been developed at trial." *Id.* (internal quotation marks and alteration omitted); *see also United States v. Salman*, 378 F.3d 1266, 1268 (11th Cir. 2004) (noting that there "is no summary judgment procedure in criminal cases" and that the Federal Rules of Criminal Procedure do not provide "for a pre-trial determination of sufficiency of the evidence" (internal quotation marks omitted)). "Furthermore, an indictment for conspiracy need not be as specific as an indictment for a substantive count." *United States v. Harrell*, 737 F.2d 971, 975 (11th Cir. 1984).

Defendants argue that the indictment is "insufficient as to count one because it fails to notify [them] of the charges to be defended against and because it does not enable [them] to rely upon a judgment as a bar against double jeopardy for

any subsequent prosecution for the same offense." (Doc. 429 at 5; *see also* Doc. 402 at 6). Defendant Joseph points out that she was named in only two overt acts within the indictment, and she argues that the indictment fails to specify any facts to show that she knew that the funds were criminally derived, that she willfully joined a conspiracy, or that she received or made any transactions for the purpose of money laundering. (Doc. 429 at 3, 5). Defendant Wheeler makes the same arguments, further noting that the indictment "merely alleges that she deposited a cashier's check that was made out to her into her own bank account." (Doc. 402 at 6–7). Thus, Defendants contend that Count One fails to provide sufficient factual detail to properly charge them with conspiracy to commit money laundering, and that the Court should dismiss that count.

The Government maintains that Count One tracks the language of the statute, notifies Defendants of the offense charged, and enables them to plead double jeopardy in a future prosecution for the same offense. (Doc. 489 at 5). The Government also argues that it sufficiently alleged the "manner and means" by which the conspiracy operated and that it is not required to detail every fact that will be used at trial to support the charge in Count One. *Id.* at 8–9.

Count One of the indictment should not be dismissed. The indictment sets forth each of the elements of a money laundering conspiracy, alleging that Defendants knowingly conspired with 21 other co-defendants and 7 co-

conspirators to commit money laundering violations. (Doc. 13 at 3–5); *United States v. Martinelli*, 454 F.3d 1300, 1310 (11th Cir. 2006) ("To obtain a conviction for a money laundering conspiracy the government bears the burden of proving beyond a reasonable doubt that: (1) two or more persons agreed to commit a crime, in this case a money laundering violation; and (2) that the defendant, knowing the unlawful plan, voluntarily joined the conspiracy." (internal quotation marks and alterations omitted)). The indictment identifies the specified unlawful activities of bank and wire fraud, the known co-conspirators by name, a range of dates during which the conspiracy took place, where the conspiracy occurred, and the manner and means the conspirators used to accomplish their objectives. (Doc. 13 at 8–12); *see, e.g., United States v. Yonn*, 702 F.2d 1341, 1349 (11th Cir. 1983) (finding a conspiracy indictment sufficient that set forth the elements of the crime, the identities of the co-conspirators, and the time frame and locale of the conspiracy).

Moreover, although the Government is not required to prove an overt act for a conspiracy to commit money laundering in violation of 18 U.S.C. § 1956(h), the Government went so far as to name each Defendant in at least one overt act. (Doc. 13 at 13–19); *Whitfield v. United States*, 543 U.S. 209, 211 (2005) (holding that convictions for conspiracy to commit money laundering in violation of 18 U.S.C. § 1956(h) do not require proof of an overt act in furtherance of the conspiracy). For

these overt acts, the Government provided the initials of the victims, specific dates and date ranges during which the alleged conduct took place, the type and account number of bank accounts held by Defendants to which the victims transferred funds, and the specific amounts of money transferred into the various accounts. (Doc. 13 at 13–19). These allegations provide specific conduct attributable to Defendants and contain additional details regarding Defendants' roles among the network of actors conspiring to commit money laundering.

Nor is the Court persuaded by Defendants' argument that Count One lacks sufficient facts to allege that they knew the funds were criminally derived, that they knowingly and willfully joined a conspiracy, or that they received or made any transactions for the purposes of money laundering. (Doc. 402 at 6–7; Doc. 429 at 5). Count One details the methods by which the conspirators conducted BEC, romance, and retirement scams to elicit funds from their victims. (Doc. 13 at 6–7). In the "Manner and Means" section of the indictment, the Government lays out generally how the conspirators communicated with one another, set up sham companies and bank accounts to receive funds from victims, and dispersed the funds into other bank accounts not associated with the fraud schemes to conceal the illegal nature of the assets. *Id.* at 8–12.

These details provided under Count One sufficiently allege that the funds transferred into Defendants' accounts were criminally derived. What the Defendants really seem to want is the evidence the Government will rely up on at trial to prove things like knowledge and willfulness. But the law does not require the Government to lay out its evidence in an indictment. *See Salman*, 378 F.3d at 1268 (noting that the Federal Rules of Criminal Procedure do not provide "for a pre-trial determination of sufficiency of the evidence" (internal quotation marks omitted)); *United States v. Kelly*, No. 1:13-CR-108-WSD-JSA, 2014 WL 1153375, at *13 (N.D. Ga. Mar. 21, 2014) ("While an Indictment must allege the essential facts constituting the offense, the Indictment need not identify the supporting proof that will be relied upon at trial to establish those facts. Here, the essential fact is that Defendant had the specific intent charged in the Indictment. The 'acts that show' this intent are not themselves the essential facts of the crime, but rather the evidence and supporting proof that the Government may introduce at trial to prove the essential fact charged.").

Finally, Defendants' appeal to *Bobo* is not persuasive. *United States v. Bobo*, 344 F.3d 1076 (11th Cir. 2003). In *Bobo*, the Eleventh Circuit found that the district court erred in failing to dismiss a count charging a scheme to defraud a health-care benefits program (as well as a conspiracy count that depended upon the

scheme to defraud). *Id.* at 1084–86. The indictment failed to specify what the defendant was trying to deprive the program of, it did not identify what about the defendant's conduct was unlawful, and it failed to cite any federal or state bribery laws. *Id.* at 1084–85. As such, there was no way to tell what scheme the defendant was alleged to have committed. *Id.* at 1085–86. Here, in contrast, Count One alleges a violation under 18 U.S.C. § 1956(h) and includes the relevant statutory language; details the BEC, romance, and retirement scams by which fraudulent funds were solicited and deposited into various bank accounts; and alleges that Defendants knowingly engaged in a conspiracy to launder money. (Doc. 13 at 3, 6–8, 13–19). Moreover, the indictment expressly names Defendants in identified overt acts, which specify dates, bank account numbers, victims, and dollar amounts. *Id.* at 13–19. Unlike in *Bobo*, here Count One sufficiently identifies the conspiracy in which Defendants are alleged to have engaged.

Nor does *United States v. McGarity* help Defendants' argument. 669 F.3d 1218 (11th Cir. 2012). There the Eleventh Circuit held that the district court should have dismissed a count charging that the defendants obstructed an official proceeding, in violation of 18 U.S.C. § 1512(c)(2), where the indictment did not even identify the proceeding—leaving the defendants with nothing more than that they "obstructed an unknown official proceeding at some time in some place by

12

some action." *Id.* at 1240. Here, as detailed above, the indictment alleges significantly more.

Count One is more than sufficient to notify Defendants of the charges against them and to allow Defendants to assert double jeopardy protections in a subsequent prosecution for the same offense. At this stage in the proceedings, an indictment is sufficient where it tracks the language of the statute and is "accompanied with such a statement of the facts and circumstances as will inform the accused of the specific offense with which he is charged." *Durrett*, 524 F. App'x at 493 (internal quotation marks and alteration omitted). Count One meets this standard, and therefore it is **RECOMMENDED** that Defendants' motion to dismiss Count One of the indictment, (Docs. 402, 429), should be **DENIED**.

## II.   Defendant Joseph's Motion to Suppress Statements

Defendant Joseph (hereinafter "Defendant") moves to suppress the statements that she made to FBI Special Agents Riser and Perry during the initial interview conducted after her arrest on March 10, 2021. (Docs. 396, 522). Defendant argues that she did not knowingly and voluntarily waive her rights and that her statements were not voluntary because, during questioning, she invoked her right to remain silent and her right to an attorney. (Doc. 396 at 2; Doc. 522 at 2–4). The Government filed a response brief. (Doc. 529). Defendant did not file a reply.

**A. Facts**

The Court held a suppression hearing on May 3, 2021, at which FBI Special Agent Joshua Riser testified. (Doc. 516). These facts are drawn from his testimony and the exhibits introduced at that hearing.

Defendant was indicted March 3, 2020, (Doc. 13), and was subsequently arrested at her residence on March 10, 2020. (Doc. 516 at 6, 7). After her arrest, Defendant was placed in a government vehicle parked in front of her residence, where she signed an "Advice of Rights," FD—395, form (Waiver) informing her of her *Miranda* rights. (*Id.* at 10, 11; Gov. Exh. 2). The Waiver explained Defendant's rights like this:

> Before we ask you any questions, you must understand your rights.
>
> You have the right to remain silent.
>
> Anything you say can be used against you in court.
>
> You have the right to talk to a lawyer for advice before we ask you any questions.
>
> You have the right to have a lawyer with you during the questioning.
>
> If you cannot afford a lawyer, one will be appointed for you before any questioning if you wish.
>
> If you decide to answer questions now without a lawyer present, you have the right to stop answering at any time.

(Gov. Exh. 2). Agent Riser read the Waiver out loud to Defendant, then Defendant

was given the opportunity to read the Waiver herself before initialing the document, confirming that she understood her rights and that she voluntarily agreed to answer questions without a lawyer present. (Doc. 516 at 10–12; Gov. Exh. 1 at 02:33–03:37; Gov. Exh. 2). Defendant gave no indication that she did not understand her rights at the time she initialed the Waiver. (Doc. 516 at 11–12). After Defendant signed the Waiver,[1] she continued to express willingness to answer questions from Agent Riser and the other FBI agent present at the time, Special Agent Megan Perry. (*Id.* at 12; Gov. Exh. 1 at 03:30-03:51).

The interview lasted approximately an hour and was recorded in its entirety. (Doc. 516 at 18, 29–31; Gov. Exh. 1). At one point during the interview, Agent Riser asked Defendant about a Navy Federal bank account that she controlled, and Defendant declined to provide any additional details about the account. (Doc. 516 at 16–17; Gov. Exh. 1 at 10:50–11:18). Agent Riser testified that, after Defendant declined to answer questions regarding her Navy Federal account, he "didn't ask further questions about that particular topic" and merely

---

[1] The Waiver included signature lines for two witnesses, which Agent Riser testified would normally be signed by himself and the other agent present during the interview. (Doc. 516 at 12–13). On the Waiver signed by Defendant, (Gov. Exh. 2), the witness signature lines remain blank, which Agent Riser testified was an "administrative oversight" on the part of himself and Agent Perry. (Doc. 516 at 12–13).

"continued the interview with subsequent questions unrelated to that account." (Doc. 516 at 17; Gov. Exh. 1 at 11:22–11:30).

Approximately midway through the interview, Defendant made mention of an attorney, declaring, "Maybe I need to wait for my lawyer because I just don't understand, and I'm really trying to answer but I feel like you guys are just, I don't know . . . ." (Gov. Exh. 1 at 29:40–29:48). Defendant then continued, noting that, "I don't want to incriminate myself not really knowing," *id.* at 30:01–30:03, to which Agent Riser answered, "Okay, so do you want to keep talking to us or do you want to stop talking to us?" *Id.* at 30:03–30:07. Defendant responded "Let me see what questions you have because I'm trying to, but, I just don't get it . . . ." *Id.* at 30:07–30:12. Agent Riser then interjected with, "I just want to be clear that you're okay to keep talking right now . . . And I just ask that because you mentioned a lawyer and I just want to make sure that you weren't saying that you wanted a lawyer and that you didn't answer any questions." *Id.* at 30:15–30:26. Defendant responded with, "Well okay let me see the next question." *Id.* at 30:23–30:26.[2] Following that exchange, Agent Riser proceeded to ask Defendant questions, and Defendant responded without any further mention of a lawyer during the remainder of the interview. *See id.*

---

[2] Defendant and the agents were at times talking over one another, making the audio somewhat difficult to understand.

16

There are no facts from the hearing to suggest that the agents threatened Defendant during the interview or that Defendant was in any way incapacitated or did not understand what the agents told her. (Doc. 516 at 9, 11, 15, 16, 18, 33). The interview was conducted inside a government vehicle, which was at first parked outside of Defendant's residence, and later en route to the courthouse, where she was turned over to the United States Marshals Service. *Id.* at 13–14. Both agents' weapons were holstered during the interview, Agent Riser described Defendant's demeanor as "cooperative," and he said that she did not appear afraid or intimidated throughout their conversation. *Id.* at 15–16. Although Agent Riser could not recall whether Defendant was handcuffed during the interview, he testified that it was "standard practice to handcuff during transport." *Id.* at 14.

Once the agents finished questioning Defendant and the transport arrived at the courthouse, the interview concluded, the recording was stopped, and Defendant was booked into the custody of the Marshals Service. *Id.* at 29, 31.

## B. Analysis

Defendant asserts in her pre-hearing "Motion to Suppress Statement," (Doc. 396), that she "did not knowingly or voluntarily waive her rights to remain silent and to have her counsel present during questioning." *Id.* at 2. Defendant refines her argument in her post-hearing brief, arguing that her statements were not voluntarily made because, during questioning, she indicated that she did not want

17

to answer questions related to a certain bank account and, later during the interview, she made mention of an attorney. (Doc. 522 at 4). Defendant claims that "[s]uch questioning runs afoul the spirit and intent of the *Miranda* decision," and that, as such, Defendant's statements during this interview should be suppressed. *Id.* at 3. Furthermore, Defendant makes no distinction between the statements she made prior to her alleged invocation of her right to remain silent and her right to an attorney, and her statements made after that point. *See id.* Thus, it appears that Defendant is arguing that the entirety of her interview from March 10, 2021, (Gov. Exh. 1), should be suppressed.

### 1. Voluntariness of Defendant's *Miranda* Waiver and Statements

First, the Court will address the argument made in Defendant's pre-hearing "Motion to Suppress Statement," (Doc. 396), that she did not "knowingly or voluntarily waive her rights to remain silent and to have her counsel present during questioning." *Id.* at 2. Although Defendant does not further pursue the "voluntariness" argument in her post-hearing brief, (Doc. 522), the Government responds to this argument in its response brief, (Doc. 529), and the Court will briefly address it.

The Fifth Amendment requires courts to "exclude from evidence any incriminating statements an individual makes before being warned of his rights to remain silent and to obtain counsel." *United States v. Luna-Encinas*, 603 F.3d 876,

18

880 (11th Cir. 2010). Defendant does not dispute that Agent Riser read her rights at the outset of the interview, or that she herself read the Waiver and initialed next to each of her enumerated rights, indicating a waiver of her *Miranda* rights at that time. (*See* Docs. 396, 522; Gov. Exh. 2). Rather, Defendant contends that her waiver was not knowing or voluntary, and therefore that her statements are inadmissible. (Doc. 396 at 2). When a defendant waives her *Miranda* rights, such waiver must be "voluntary, knowing, and intelligent." *United States v. Barbour*, 70 F.3d 580, 585 (11th Cir. 1995) (citing *Moran v. Burbine*, 475 U.S. 412 (1986)). A court looks at the totality of the circumstances when evaluating voluntariness, and the question ultimately is whether the defendant's statement "was the product of an essentially free and unconstrained choice." *Hubbard v. Haley*, 317 F.3d 1245, 1252 (11th Cir. 2003) (internal quotation marks omitted). Among the factors a court should consider "are the defendant's intelligence, the length of his detention, the nature of the interrogation, the use of any physical force against him, or the use of any promises or inducements by police." *Id.* at 1253.

"Those cases where courts have found confessions to be involuntary have contained a substantial element of coercive police conduct." *United States v. Patterson*, No. 1:06-CR-500-1-TWT, 2007 WL 2331080, at *4 (N.D. Ga. Aug. 10, 2007) (internal quotation marks omitted). "Sufficiently coercive conduct normally involves subjecting the accused to an exhaustingly long interrogation, the

19

application of physical force or the threat to do so, or the making of a promise that induces a confession." *United States v. Thompson*, 422 F.3d 1285, 1295–96 (11th Cir. 2005) (internal quotation marks omitted).

Here, there is nothing to suggest that Defendant's waiver of rights was anything less than voluntary, knowing, and intelligent. Agent Riser testified that Defendant was "cooperative," that she did not appear afraid or intimidated, and that Defendant gave no indication that she was unable to understand or comprehend her rights or her decision to waive them. (Doc. 516 at 9, 11, 15, 16, 18, 33). Moreover, the interview lasted approximately one hour, during which time both agents' guns were holstered, and there is no evidence that either agent threatened or physically harmed Defendant during the course of the interview. *See id.* Though Defendant might have been handcuffed during the interview, this alone does not rise to the level of coercion. *See United States v. Crawford*, No. 1:18-CR-318-MLB-JKL-2, 2019 WL 7559737, at *4 (N.D. Ga. Sept. 24, 2019) (finding that being handcuffed and restrained by a seatbelt falls far short of the type of physical duress necessary to establish coercion), *adopted by* 2019 WL 5800271, at *3 (N.D. Ga. Nov. 7, 2019) ("As the Magistrate Judge correctly found, the handcuffs and seatbelt do not, on their own, render a confession involuntary."). Simply put, there

is nothing in the record to suggest that Defendant's waiver was anything less than knowing, voluntary, and intelligent.[3]

### 2. Defendant's Right to an Attorney

Next, Defendant argues that her statements regarding an attorney, and specifically her assertion that, "Maybe I need to wait for my lawyer," should be construed as an invocation of her right counsel, at which point the interview should have ended. (Doc. 522 at 3–4; Gov. Exh. 1 at 29:40–29:48).

By now it is beyond debate that, if a suspect requests a lawyer, further questioning must cease. *Davis v. United States*, 512 U.S. 452, 458 (1994) ("But if a suspect requests counsel at any time during the interview, he is not subject to further questioning until a lawyer has been made available or the suspect himself reinitiates conversation."). But the request for a lawyer must be unequivocal and unambiguous. *Id.* at 459 (holding that "if a suspect makes a reference to an attorney that is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect *might* be invoking the

---

[3] And for the same reasons that the Court finds that the wavier was voluntary, so too were Defendant's subsequent statements to the agents. *See United States v. Jones*, 32 F.3d 1512, 1516 (11th Cir. 1994) ("We first decide whether the law enforcement officers complied with the requirements of *Miranda v. Arizona*; if so, we then determine if the confession was voluntary." (citation omitted)). Here again, there is no evidence to suggest that Defendant's statements were involuntary.

right to counsel, our precedents do not require the cessation of questioning" (emphasis in original)). "Invocation of the *Miranda* right to counsel requires, at a minimum, some statement that can reasonably be construed to be an expression of a desire for the assistance of an attorney." *United States v. Soleimani*, No. 1:18-cr-216-ELR-RGV, 2019 WL 7559295, at *19 (N.D. Ga. Sept. 25, 2019) (internal quotation marks omitted), *adopted by* 2019 WL 6002409 (N.D. Ga. Nov. 14, 2019). Even statements that directly mention an attorney or a lawyer — without being an unequivocal request for one — fall short. *See id.* at *20 (collecting cases where questions or statements such as, "maybe I should talk to a lawyer," "could I call my lawyer," "I might want to talk to an attorney," and "Do you think I need a lawyer?" — along with many others of the same type — were not deemed sufficiently unequivocal or unambiguous).

In light of this precedent, the Court cannot conclude that Defendant unambiguously and unequivocally requested a lawyer when she made mention of an attorney and expressed a desire not to incriminate herself. Like the defendant in *Davis*, Defendant's statement is qualified, expressing that "*[m]aybe*" she should wait for a lawyer. (Gov. Exh. 1 at 29:40–29:48) (emphasis added); *Davis*, 512 U.S. at 461-62 (finding that the defendant's statement "maybe I should talk to a lawyer" was not an unambiguous or unequivocal request for an attorney and that it was proper for police to continue questioning the defendant following this statement).

22

Moreover, after Defendant made this statement, Agent Riser specifically asked, "Okay, so do you want to keep talking to us or do you want to stop talking to us?" to which Defendant answered, "Let me see what questions you have . . . ." (Gov. Exh. 1 at 30:03–30:12). The agent again asked whether Defendant wanted to keep talking, noting that she mentioned a lawyer, and Defendant said, "Well okay let me see the next question." *Id.* at 30:15–30:26. And from there the conversation continued. This interaction mirrors the Supreme Court's admonition that, "when a suspect makes an ambiguous or equivocal statement it would be good police practice for interviewing officers to clarify whether or not he actually wants an attorney." *Davis*, 512 U.S. at 461. In this situation, Agent Riser asked a clarifying question to ensure that Defendant was not invoking her right to an attorney before he proceeded with the interview. (Gov. Exh. 1 at 30:15–30:26). Had Defendant wished to discontinue the interview and wait for an attorney, she could have said so—instead, she stated that she wanted to "see the next question" and, upon hearing it, kept talking. *See id.* Simply put, Defendant did not unambiguously and unequivocally invoke her right to an attorney at any point during the interview.

### 3. Defendant's Right to Remain Silent

Finally, the Court will address Defendant's argument regarding her right to remain silent. Defendant argues that her refusal to answer one question concerning a Navy Federal account should be construed as an invocation of her

right to remain silent. (Doc. 522 at 2–3; Gov. Exh. 1 at 10:50–11:18). Defendant argues that after she refused to answer the question about the bank account, it was improper for the agents to continue questioning her and that, as such, her statements should be suppressed. (Doc. 522 at 3).

"When a person undergoing a custodial interrogation states that he wishes to remain silent the questioning must end. . . ." *United States v. Ochoa*, 941 F.3d 1074, 1098 (11th Cir. 2019) (internal quotation marks omitted). However, a suspect invoking his right to remain silent must do so unambiguously; "an ambiguous or equivocal act, omission, or statement" will not suffice. *Berghuis v. Thompkins*, 560 U.S. 370, 381–82 (2010); *see also Owen v. Fla. Dep't of Corr.*, 686 F.3d 1181, 1192 (11th Cir. 2012) (holding that "a defendant who wishes to invoke his right to remain silent must do so unambiguously and unequivocally" (internal quotation marks and alteration omitted)). "An unequivocal and unambiguous invocation of the right to remain silent is one articulated sufficiently clearly that a reasonable police officer in the circumstances would understand the statement *to be* a request to exercise his right to remain silent and terminate the interrogation, not that it *might be* a request to remain silent." *Owen*, 686 F.3d at 1194 (internal quotation marks omitted, emphasis in original).

In *United States v. Mikell*, the Eleventh Circuit addressed circumstances very similar to those here. 102 F.3d 470 (11th Cir. 1996). In *Mikell*, after waiving his right

24

to remain silent, the defendant refused to answer certain questions during the course of an interview with the police. *Id.* at 473–74, 476. He argued, like Defendant does here, that his refusal to answer particular questions constituted an unequivocal invocation of his right to remain silent. *Id.* at 476. The Eleventh Circuit disagreed, holding "that a suspect's refusal to answer certain questions is not tantamount to the invocation, either equivocal or unequivocal, of the constitutional right to remain silent and that questioning may continue until the suspect articulates in some manner that he wishes the questioning to cease." *Id.* at 477; *see also United States v. Thomas*, 176 F. App'x 997, 997 (11th Cir. 2006) ("The refusal to answer a specific question is not tantamount to an invocation of rights as to other questions.").

Here, Defendant did not unambiguously or unequivocally invoke her right to remain silent. Defendant declined to answer one question posed by Agent Riser regarding a Navy Federal bank account in her name. (Gov. Exh. 1 at 10:50–11:18). Following Defendant's refusal, Agent Perry posed an entirely different question to Defendant, which she answered without hesitation, and the interview continued. *Id.* at 11:22–11:30. At no point during this interaction did Defendant unambiguously or unequivocally assert her right to remain silent, and as such she did not invoke that right. For all the reasons stated above, Defendant's motion to suppress statements, (Doc. 396), should be denied.

**III.   Conclusion**

For the reasons stated above, the undersigned **RECOMMENDS** that Defendants' motions to dismiss Count One of the indictment, (Docs. 402, 429), and Defendant Joseph's motion to suppress statements, (Doc. 396), be **DENIED**.

**IT IS SO RECOMMENDED,** this 11th day of January, 2022.

_____
CHRISTOPHER C. BLY
UNITED STATES MAGISTRATE JUDGE